# CRIMINAL COURT OF BALTIMORE CITY.

Filed November 15, 1926.

### IN RE: PETITION TO STRIKE GRAND JURY REPORT.

HENRY G. PERRING, ROBERT GARRETT, HENRY D. HARLAN, J. BARRY MAHOOL, JACOB EPSTEIN, WILLIAM KALB, HOWARD W. JACKSON, BERNARD L. CROZIER.

*Roland R. Marchant* and *Philip B. Perlman* for Public Improvement Committee.

*Frederick J. Singley* for Public School Association and Wm. D. Lilly.

O'DUNNE, J.—

In spite of a mass of pleading, petitions, citations, answers, applications to intervene, motions in nature of motions *ne recipiatur*, a wealth of legal citation, fervid oratory and ill-conceal-

ed animosities in more than six hours of argument, yet stripped of all its non-essentials, the question, after all is a very simple, a very narrow and technical one, namely a motion to strike out a portion of the report of the retired Grand Jury, because, failing to present or indict, they made reports touching the public welfare and public safety of children housed in public schools, which reflected on the reputation or professional standing of Henry G. Perring, supervising architect in connection with the Clifton High School, and merely because he was employed by the most estimable gentlemen composing the Public Improvement Commission, they in turn feel it was an indirect reflection on their judgment and competency, and therefore they also become petitioners.

For the purposes of the case, I see no occasion to consider anything except the report of the Grand Jury and the application of the petitioners to strike out that part of the report dealing with the Clifton High School.

I therefore will dismiss the answer of the Public School Association (heretofore given leave by this Court to intervene), as I see no purpose to be served by their intervention in this proceeding.

The law of the case:

In Edwards on Grand Juries, p. 157, the author says:

"In their reports they frequently take occasion to discuss various matters affecting the public welfare, criticise public officials, act as censors of the morals of the community, and make *recommendations which it is impossible to carry into effect.*

"That they are acting outside their duties as Grand Juries in making such presentments will hardly be doubted. As the official accusers of government, their duty is to present persons, not things.

"If they have any evidence of the things which they thus set forth, it is their duty to the public and to themselves, under their oaths, to present the individuals guilty of such offenses."

Quoting Judge Stowe's Charge to Grand Jury, 3 Pitts Report (Pa.), 179:

This is a technically correct statement of the law and supported in a general way by a great array of authority read by the learned counsel for the petitioners, which list of authorities I attach hereto as a convenient form of preserving the references, should future occasion arise for consideration of similar questions. Most of the cases are analyzed in the note to 22 A. L. R. 1267.

Whatever the practice has been elsewhere, from time immemorial it has been customary for Maryland Grand Juries to report *generally* on the public welfare, to recommend legislation, forms of public economy, simplified court procedure, raise or diminution of salaries, the continuance or abolition of the whipping post, its application to new offenses, commend public officials, and wisely or ignorantly discuss matters pertaining to public justice and kindred subjects. These generalities can do no harm and may often be productive of much good to the community.

Where they pass from that field into the personal condemnation of individuals, other than by mere presentment, they transcend their prerogatives as Grand Jurors. The step from wholesale criticism of individuals to that of "common scold" is but one of gradation and frequency of repetition, and is a practice not to be sanctioned, and certainly not tolerated over legal objection such as has been interposed in this case. Those paragraphs of the report on the Clifton High School which designate either Henry G. Perring or the members of the Public Improvement Commission and reflect on them, or either of them, will be ordered expunged.

The application, in both petitions, is to strike the *entire* report on the Clifton High School from the file, and the case of Bennet vs. Kalamazoo Judge, 183 Mich. 200, is referred to as authority for the procedure that if not so done a writ of *mandamus* may be obtained to compel the Court to strike it from the file.

This Court is content that petitioners shall pursue that remedy, and refuses petitioners' application to strike out any part of the report except the paragraphs set forth at the end of this opinion.

No one, I think, will question for a moment the high toned character of the estimable gentlemen composing the Public Improvement Commission, and who have been willing to serve the com-

munity in that capacity, have no doubt given generously of their time and talent; but must the taxpayers of Baltimore accept without *murmur*, and with facial control showing not a trace of disappointment, over the Clifton High School, merely because remotely and indirectly, through the medium of engineers, supervising architects, contractors and sub-contractors, the Clifton High School can be said to *emanate* from the Public Improvement Commission in their expenditure of the people's money in the cause of education?

The petitioners in their pleadings resent with marked indignation the criticism by the Grand Jury of the supervising architect, because he was *selected by them;* they resent it as an indirect criticism of themselves because of their somewhat remote responsibility for the completed product. The argument of their distinguished counsel was characterized by ill-suppressed bitterness of feeling, free expressions of bad faith attributed not only to the Grand Jury but to the witnesses who appeared before the Grand Jury. Even the report of the special committee appointed by the Mayor and consisting of the Comptroller and the City Register, with expert architectural services, came in for its share of their condemnation. It was from the report of this committee, which took nearly 500 pages of testimony, that the most objectionable language of the Grand Jury was copied *almost verbatim.*

Standing on their undoubted legal rights, they come into Court and ask to strike from the Grand Jury report language of criticism by inference and indirection remotely reflecting on them because of their ultimate responsibility.

We remember the spirit of the biblical gentleman who went up in the temple to pray, and thanked God he was not like other men, even as these propagandists! Petitioners' prayer will be found in paragraph six, as follows:

"6. That the work done by your petioners, as members of the Public Improvement Commission, particularly in connection with the extension and amplification of educational facilities, instead of being unanimously received in the manner to which good public service is entitled, has been attacked by a certain group of people in the community, who have apparently been, for several years past, attempting to destroy the public confidence in the Commission and its employees. The persons responsible for these attacks have not hesitated to use unjustifiable means to attain their ends, and have conducted a continuous propaganda against the Commission in all sections of the city. Being in a great degree ignorant of the volume and complexity of the problems involved, and almost entirely ignorant of the facts on which the Commission's acts have been based, these persons have, nevertheless, assumed a knowledge they have never possessed, and have undertaken to disseminate unfair and untrue statements throughout the community in their effort to embarrass and hamper the work of the Commission, and to create suspicion of the value of its achievements. Your petitioners believe that these people, and especially their leaders, are seeking to revenge themselves because of their failure to dictate to the members of the Commission, and to direct the course of its activities, particularly in matters affecting the school system. Mindful of their oaths of office, your petitioners have always declined to be influenced by political or unworthy considerations, and have insisted and so conducted themselves that nothing but those things in the public interest should guide its deliberations and control its decisions, and every act of the Commission is and always has been recorded and is open to public inspection. Actuated by malice or by other motives, the basis of which is not known to your petitioners, the persons launching the attacks and criticisms have inflamed the public mind with a mass of charges and statements of all kinds, which, taken together, constitute, we respectfully submit, one of the most unfair and dangerous sets of misrepresentations ever turned against a public body in the City of Baltimore. One of the results of these charges has been the holding of one investigation after another, some by tribunals as prejudiced and unfair as those making the charges, but none of which has yet been able to point to any act or omission by the Commission, or any of its agents, not susceptible of easy explanation to any fair-minded or reasonable man, and most of which investigations have resulted in demonstrating that no reason whatever existed for the condemnation by the self-appointed censors. In order, however, to prevent the truth from becoming

known, the persons making the attacks here, as soon as they learned of failure, sought to distract public notice by making new and additional charges and criticisms just as unfounded as those already disproved."

Judging from the arguments of counsel, which were surcharged with bitterness of feeling, the fervid prayer in paragraph six of petition was probably the best effort counsel could make to surpress the intensity of their feeling. This in turn was probably ratified by the public-spirited citizens composing the Public Improvement Commission, in much the same manner that they indirectly ratified the Clifton School, through the various and sundry agencies responsible for its construction. As they have come into Court somewhat in the nature of an equity proceeding, to strike inflammatory language from written pleadings, this Court, of its own motion, will also strike from the record of this case the equally objectionable paragraph of the petitioners set forth in paragraph 6; and in as far as the petition of Henry G. Perring adopts the petition of the members composing the Public Improvement Commission, the said paragraph 6 so adopted by him will also be stricken from his petition, for the same reason.

Counsel have waxed eloquent over the law of "libel by indirection," yet they unhesitatingly resort to the same method when it serves their purpose. As the persons, agencies, etc., referred to are denied right to participate in this proceeding, having no such interest in this simple application as in my judgment entitles them to intervene, the attack on them, designated in law as "scandal" in pleading, will also be stricken from the records.

And touching the good faith of the Grand Jury, attempting to act in what is conceived to be the public interest, and the sincerity of whoever may be the persons who are so bitterly referred to in said paragraph 6 of petitioners' pleading, let me summarize some of the evidence before the late Grand Jury which caused the alarm of the Jury about Clifton High School.

Charles H. Osborne, Chief of Bureau of Buildings, said:

"I found the building was absolutely safe, *but* the building, especially the two gymnasiums, boys' and girls', there are a good many cracks in the walls

* * * In the boys' gym the wall was not only cracked but the wall was *pushed out into the room.*

"I found that the wall was pushed in due to the weight coming on the wall, brought to the wall by the heavy mullions between the sash."

As to specifications:

"I understood that the specifications called for clay brick."

"The section under the east wall had bulged in possibly two inches."

*"That bulge was due to improper construction."*

"The steel lintel did not take the load; in other words, they left the lintel lying on the wood frame (of the windows). *That is an error on the part of the contractor.*

"The whole load of the lintel was carried on the window frames."

After describing the proper way to bond a brick wall (bonding every five courses), he says:

"In this wall, it is apparent from the cracks, or it is my opinion, that is the cause of it, that they only bonded the inside face wall of the gym to the core of the wall every five feet. The cracks are five feet apart, around this room."

*"This is a less expensive way of constructing a building."*

"There are two stairways leading from the first floor down to the locker room that *show faulty* construction, faulty design."

"I would not say that is the fault of the architect. * * * *The small riser is too light to carry the load.* The result is that the cement on the platform at that landing, and also at the top, is *cracked.* They have removed it and replaced it with *wood.*

"It is safe, because there is a wood post under it to prevent its breaking down, but it is my *intention* to reinforce the steel frame, and *make that safe,* and to remove the wood posts."

Then, he naively adds:

"The only thing that could have happened, from my investigation, that possibly that section of wall under the east window of the boys' gym might have fallen in on the floor, but the building would not have collapsed."

"I think the stairway was structurally unsafe prior to the time I put that brace in. Yes, structurally unsafe."

"On that east window the cracks went clear through the wall."

Mrs. Bauernschmidt, among general discussions, discusses the question of substitution against specifications, and quotes Mr. Sperry as authority that there is no justification for it.

Describes the substitution of lower price electric motors, the like of which had never been known in Baltimore.

Chambers arch clay brick and nothing else specified; but instead a cement brick was substituted.

Describes the joists put under the stairway as big as her body. Was told that it was put there because when the boys came down the stairway it swayed, and they put the joist there to support it.

Refers to the Sperry-Doeleman report that in some instances steel specifications had been cut 40 per cent., in other cases 20 per cent.

Said she was hunting for an impartial investigation to be made, then came to the Grand Jury in hope of doing something before too late and before injury to thousands of children. Does not claim to know whether the building is safe or not; simply wants to know and be sure, in the interest of those she represents, the school children.

Quotes Mr. Pennington, the architect, as protesting against the substitutions for things in specifications, etc.

And as bearing on the justness of the allegation in the petition of the Public Improvement Commission that the Grand Jury failed to consult the only official source of information where the facts are recorded, to wit, the records of the Public Improvement Commission, it may be said in passing, that the *most permanent record of the facts is in the Clifton High School itself* (if it is permanent!).

After the Grand Jury, on August 17, took the testimony of Mayor Jackson, his Honor the Mayor the next day transmitted to the Grand Jury a report made to him under date of August 17, 1926, on the Clifton High School, which school construction was completed, I believe, some time in 1923, and at an expenditure of over a million dollars of the money of the taxpayers of this community.

Imagine what would be the feelings of an individual if three years ago he had paid over a million dollars for a home, and within three years the Chief Inspector of Buildings gave the following description of it in August, 1926, of the condition of his million-dollar home:

"DEPARTMENT OF PUBLIC WORKS
BUREAU OF BUILDINGS

August 17, 1926.

Honorable Howard W. Jackson,
Mayor of Baltimore City.

Honorable Sir:

Following your instructions for report on physical condition of the Clifton Park School, I have made a number of visits to the school to ascertain the weaknesses, if any, and to determine whether there was any grounds for the adverse propaganda that has been broadcast against the building. Generally speaking, the school building is in good condition and shows no serious defects outside of the Boys' and Girls' Gymnasiums; here I found some trouble due to careless workmanship, but nothing to endanger the building, report on all of which I beg to submit, as follows:

*Third Floor:*

Southeast corridor, crack in east partition wall.

Room 320—Crack in south partition.

Room 335—Crack in partition at northwest corner.

Room 316—Crack in west partition.

Room 314—Crack in east partition.

Room 312—Crack in east and west partitions.

Room 310—Crack in east partition, and in northeast corner.

Room 308—Crack in east and west partitions.

Room 306—Crack in east partition and southwest corner.

Rooms 309-311—Crack in partition over door between these rooms.

Room 305 — South partition, hair cracks.

Room 303—North and south partitions, hair cracks.

In the other rooms on this floor the walls are in perfect condition.

The cracks noted in the above rooms are all due, in my opinion, to shrinkage in the partition material and not to any settlement in the building.

In the stair towers there are vertical cracks in the brick walls, and in the

north wall of the central corridor there are hair cracks showing, also, on the gymnasium side of the wall. These vertical cracks in the brick walls are evidently due to the excessive shrinkage in the cement bricks used.

*Second Floor*:

Room 202—Crack in south partition.

Room 2-K—Crack in east partition in arch over doors.

Room 213—Crack in northwest corner.

These cracks are evidently due to shrinkage in partition material.

The other rooms on this floor are in good condition and show no hair cracks in partitions.

The brick walls of the stair towers on this floor show vertical cracks similar to those on the third floor and probably due to the same cause.

The partition wall on this floor, between central corridor and gymnasium, shows cracks similar to those on third floor.

*First Floor*:

Rooms 100, 102, 104, 106, 108, 110, 112, 114, also 107 and 111—Partition walls are in perfect condition.

Room 109—North partition wall shows cracks in the partition directly under the clock, which would indicate that same was probably caused by electric conduit at this point.

In the north corridor entrance to doctors' and nurses' suite there is a large crack in the partition over the door, which indicates a settlement in this partition.

Gymnasiums—These gymnasiums are not plastered, but are finished with cement brick walls. As conditions are different in the two gymnasiums, I will treat each one separately.

*Girls' Gymnasium*:

East Wall—The north end of the lintel over the north window in this wall was 3-16″ clear of the bearing plate. This caused the load which should have been carried by said lintel to be transferred directly by the mullions in the window frame to the wall below, which caused the inner face of this wall to be separated from the balance of the wall and moved inward about one inch at the sill level. This particular section of the gymnasium wall created some apprehension on the part of the principal and started

investigation to determine the cause. There were vertical cracks at each end of this window frame, running to the floor, and vertical cracks are not caused by settlement. My opinion is that vertical cracks and bulging in this section of the wall was caused by the vertical load, and on this theory I had the wall opened at the end of the lintel, with the above results. *On taking out the bulged section below this window sill I found at the north end seven courses of brick in the wall, with absolutely no mortar. The inner facing of this wall was not bonded to the rest of the wall.* The south window in this wall shows hair cracks at each end of the window sill, running to the floor, but not sufficient to cause any apprehension. On the north wall the east end of the lintel over the east window was ⅛″ clear of the bearing plate. The west end of this lintel had full bearing. The lintels over the other two windows in this wall also had full bearing. There were, however, vertical hair cracks at each end of the sill, running from sill to floor. The lintel over the window in the west wall had full bearing, but there were hair cracks running from the window sill to the floor. Over three of the windows there was also a hair crack running from the top of the windows to the ceiling. These hair cracks near the ceiling did not appear on the second floor. Near the three windows above mentioned there are horizontal hair cracks approximately 5′ apart or scaffold high. This, in my opinion, is caused by improper bonding of the interior faces of the wall, it being apparent that these inner faces were bonded full at each scaffold height. The south partition wall of this gymnasium shows vertical hair cracks extending the full height and these cracks show on the corridor side in the first and second floors.

Aside from the bad section of the east wall which was caused by the load from the lintel on the window frame, the cracks in these walls would indicate there had been excessive shrinkage in the brick, which were made of cement and sand.

*Boys' Gymnasium*:

The south end of lintel over window in east wall was 1-16″ clear of the bearing plate. The north end of this lintel had full bearing. In the north wall, east end of east lintel and west

end of west lintel were both ⅛" clear of the bearing plates. Lintels in the west wall had full bearing. The east, west and north walls in this room show hair cracks running from each end of window sill to the floor. The south wall between this room and the corridor shows vertical hair cracks similar to those in the girls' gymnasium.

In both the girls' and the boys' gymnasiums the defective lintels have been wedged up to full bearing and the brickwork replaced. The hair cracks in both of these rooms I believe were caused by excessive shrinkage in the cement brick.

The stairways from first floor to girls' locker room and from first floor to boys' locker room are both defective, due to faulty design and construction. In both of these stairs the stringer from the basement floor to the stair platform is spliced into the first landing to first floor. These stairs have been shored up with temporary posts, which has removed the danger. However, both flights of stairs should be provided with steel column.

Regarding stone trim on the building I find a great many of the joints are open, which will permit water to enter and cause disintegration of the wall. This should be pointed up at once to prevent further seepage.

The stack above the roof shows hair cracks on the east and west sides and in the basement cracks are in the north and south sides. These cracks are not sufficient to affect the boiler draft and I do not believe they need any further consideration.

Summarizing the work on the building, I find same generally good and no indication of undue settlement in the building. I am of the opinion, however, that *the use of cement brick in buildings of this size should be prohibited on account of the unsightly hair cracks in the walls made up of this material.* These cracks, in my opinion, do not materially weaken the walls and I consider the building strictly safe."

Respectfully submitted,

(Signed)   C. H. OSBORNE,
Chief."

Joseph E. Sperry (elsewhere referred to as "Dean of Architects") inspected building after studying specifications:

"The walls were built of cement bricks. I took one of those bricks in my hand and broke it in two." *Clay* bricks were specified.

"I went to the pile or place from which they were building the walls, and part of the bricks had disintegrated and were lying at the bottom of the pile; had been crushed by the weight of the pile itself. Other bricks we took up and broke right in two.

"Clay brick is stronger than cement brick (describing why, and the hydraulic pressure used in cement bricks), while good cement brick can be made, if you use enough cement, but you can hardly hold it on the wall because concrete will not adhere to concrete after the first mass has set. If you try to bond to that, it is impossible to do it."

The Sperry inspection was latter part of September, 1923:

"Does not consider the particular cement bricks there as satisfactory *building material for any purpose.*

"Inside scaffolds were substituted for outside scaffolds, without any deduction from the contract price, and he there estimates a saving of $1,500; but adds that this would make no difference in the STRENGTH of the building, none whatever.

"The specifications were changed after the contract was let.

"The bidders bid on the specifications. The successful bidder had the specifications cut.

"In some cases the building did not comply with the building code. The floor joists in one case were about 40% shy.

"He explains that the Building Code calls for a strength for given loads—that building even defective in strength as prescribed in Building Code may be perfectly safe for the load it is actually carrying, but if given the load the specifications or Building Code designed it to carry it would be unsafe. The actual loads may not be as high as provided for in the Building Code.

"Mr. Graham and Mr. Dolfield were the committee appointed by the Mayor. They asked Mr. Doeleman to make an examination of that building, and we merely reported to the Mayor's committee. This is a copy of our report (submitted).

Asked by the Grand Jury:

"Assuming that the contractor saved $5,000 or $6,000, with the consent of the supervising engineer, is it customary to make a divvy there?

"A. Oh, I should not say so. I would simply say not. I have never heard the slightest charge against the engineer or the supervising engineer. I think that would be unthinkable, for any professional man, any more than a lawyer would split his fee with the counsel or client on the other side."

Note: This is the testimony of the man referred to by counsel for petitioners in their argument as the testimony of a *"disappointed architect."*

Herman T. Doeleman testified that he and Mr. Sperry figured out the saving to the contractor, in substituting cement brick for clay brick as $5,000, including other substitutions (reference to the Sperry report showing the exact figure to be $5,180).

It further appears that the Sperry-Doeleman report was submitted to the Graham and Dolfield Committee (Comptroller and City Register) and that they held four hearings and took testimony, and that said Comptroller and City Register made a report to the Board of Awards, with the stenographic testimony of 485 pages attached, which report covers some matters extraneous to the Clifton High School, the same being before the Grand Jury and considered by them. The said report is still peacefully slumbering with the Efficiency Commission.

Extracts from the Graham-Dolfield Report to Board of Awards could not well be quoted without being open to some of the same objections made to the report of the Grand Jury.

It so happened that on Friday, the day of the argument, some one had summoned Mr. William Lee Rawls, President of the School Board. As he was in Court, I took advantage of the fact to ask him if the newspaper statement is correct, that the School Board has arranged for an impartial investigation of Clifton High School building, and that $5,000 had been appropriated and is available for such an examination. He confirmed this fact.

Provision is therefore now made for a more intelligent and thorough examination of the construction of this building, with the services of paid experts, than can be made by a Grand

Jury, or a State's Attorney or a Court. If, after their examination they find evidence of the commission *of any crime*, or the *violation of any law*, by any one in connection with the construction of said Clifton School, either this, or some other, Grand Jury will always be available to hear the evidence and to "present and indict," if presentment and indictment are warranted by the facts.

If any one, at the present time, has knowledge of any facts constituting a violation of law, and will submit the same to the State's Attorney, he will be found to be vigilant in the just prosecution of the case.

Match the expenditure of over a million dollars of the money of the taxpayers with the report of the Chief Inspector of Buildings within three years from its completion, and it is idle to tell the people of this community that it is insolence on their part to criticise any one who had anything to do with the construction of the Clifton High School. There may be things that under the law and precedents a Grand Jury cannot do, with legal propriety, unless they accompany the same with indictment (and some of the cases say they cannot even *criticise* them, but can merely indict). On the other hand, under the authority of the Craig case in 263 U. S., with opinion by Chief Justice Taft, these petitioners can attack the integrity of a retired Grand Jury in criticising any or all of those responsible for the construction of the character of building the public has in the Clifton High School, paid for by the taxpayers, and not be in contempt of Court for such attack upon the Grand Jury. Small wonder, then, that to the lay mind the technicalities of the law sometimes seem to breed *contempt in fact!*

The only paragraphs stricken out are:

"The specifications of the Clifton Park High School Building provided for the use of Chamber's arch clay brick in certain of the important walls. With the approval of the Consulting Engineer, Mr. H. G. Perring, the contractor, J. Henry Miller Company, Inc., substituted for the specified arch clay brick, cement brick. Evidence which was presented to the Grand Jury indicated that the reason for this substitution was entirely inadequate and reveals, furthermore, that the partic-

ular cement brick furnished was either of an inferior grade or not manufactured properly. In spite of the fact, apparently, that the cost to the contractor of this cement brick was the same as the specified arch clay brick would have been, the smaller number of cement brick necessary, owing to their larger size, made it possible for the contractor to realize a saving said to be $5,180, for which the city got no credit."

"Information before us leads us to believe that the cement bricks used in this building were not equal in strength and in fireproof quality to the specified brick, and the reasons which we have been able to ascertain for this substitution are not convincing. According to evidence before us, the Supervising Engineer, Mr. H. G. Perring, admitted his responsibility for the redesign of the structural steel work in the building. This work as it now exists in the building, according to the evidence before us, causes the floor joists to be about 15% deficient, and the joists under the shops to be 48% deficient, in comparison with the Building Code of the City of Baltimore. It must be said, however, that this, according to our information, does not necessarily reveal an unsafe condition so far as this particular construction is concerned. It shows evidence, however, that the plans were not carefully checked either by the Public Improvement Commission or the Building Inspector's office."

"However, before the report was received the awarding of the contract for the erection of the new Baltimore City College building presented itself, and the Grand Jury, feeling that from past performance in the question of the Clifton Park High School, the lowest bidder on the Baltimore City College Building did not merit public confidence. The Grand Jury, therefore, on August 11, communicated with the Board of Awards, urging them to delay awarding the contract for the erection of the new Baltimore City College building until such time as the Grand Jury's investigation had been completed. This recommendation the Board of Awards did not see fit to accept."

"The representative of the Supervising Engineer at the building was not giving proper attention to this work. It occurs to us that possibly the numerous cracks in the various partitions might well be due to this evidence of carelessness."

"We feel that Mr. Henry G. Perring has manifested not only the utmost incompetence in this work, but we feel that his work has been characterized by improper safeguarding of the city's interests, lack of good judgment, haste in decisions and an assumption of authority which does not belong to his position. We believe that a continuation of the present method of supervision will not only result in extravagant spending of the public money but may create a menace to the lives and safety of the children housed in future buildings to be erected."

Together with the sixth paragraph of petition of members of the Public Improvement Commission set out in the opinion.

List of petitioners' authorities cited in argument:

In re Gardiner, 64 N. Y. Supp.

Jones, 92 N. Y. Supp.

Jones, 181 N. Y. Supp.

Osborne, 125 N. Y. Supp. 313.

Heffernan, 125 N. Y. Supp. 737.

Woodbury, 155 N. Y. S. 851.

Crosby, 213 N. Y. Supp. 86.

Paige vs. Herald Pub. Co., 61 Southern, 345.

Bennett vs. Kalamazoo Judge, 183 Mich. 200.

Bennett vs. Stockwell, L. R. A. 1917-F.

Clair vs. State, 28 L. R. A. 367.

Annotated Notes, 22d A. L. R., 1267.

Lloyd vs. Carpenter, 3 Pa. Law Journal Repts. (3 Clark) 188, bottom page.

Rector vs. Smith, 11 Iowa 302.

Rich vs. Eason, 180 S. W. 303—Iowa case.

Poston vs. Railway, 36 D. C. Appeals, 359; also 30 L. R. A. (N. S.) 785.

Kiefer vs. State, 90 Md.

Blaney vs. State, 74 Md. 153.

People vs. Sellick, 4 N. Y. Cr. Rep.

4 Blackstone, Ch. 23 (star page 301).

Bill of Rights, Art. 6.

Vol. 2 of Code, Art. 50, Secs. 10 and 22.

City Charter, Sec. 604.

Vol. 1, Bagby's Code, Art. 27, Sec. 696.

City Charter, Sec. 343.